```
            UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ALABAMA
                   SOUTHERN DIVISION
```

FILED
02 MAR -7 PM 4:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

MEGHAN L. VELLA,                }
                                }
        Plaintiff,               }
                                }
v.                              }     CV 00-AR-1904-S
                                }
ALABAMA CENTRAL CREDIT          }
UNION, et al.,                  }
                                }
        Defendants.              }

ENTERED
MAR 7 2002

### MEMORANDUM OPINION

Before the court are two motions filed by defendants, Alabama Central Credit Union ("Alabama Central") and Joe Kiser ("Kiser"): a motion for summary judgment and a motion to strike the affidavit of plaintiff, Meghan L. Vella ("Vella").

Vella instituted this action on July 10, 2000, asserting federal claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. She appends state law claims of invasion of privacy, negligent supervision and training, and negligent hiring and retention. Her federal claims relate to alleged sexual harassment by her immediate supervisor, Kiser, and to her termination in retaliation for her complaints about the hostile work environment. In her brief in opposition to the motion of defendants for summary judgment, Vella concedes that her state law claim for invasion of privacy and her claims against Kiser under Title VII are due to be dismissed.

33

I.   MATERIAL FACTS

Vella, a female, was hired by Alabama Central in July 1999, as Branch Manager of Alabama Central's Homewood branch. (Vella Dep. at 22.) Kiser, the Senior Vice President of Alabama Central, hired and interviewed Vella.[1] (*Id.* at 31-32; Kiser Dep. at 7.) Vella asserts that, during her eight-month tenure at Alabama Central, Kiser sexually harassed her and that his treatment of her created a hostile work environment. Part of Kiser's duties as Vice-President included supervising the branch managers. Kiser thus visited the Homewood branch, but he did so infrequently. In fact, Vella testified that Kiser generally visited her branch once or twice a month. (Vella Dep. at 168-69.)

Vella claims that, during her employment, Kiser made several inappropriate comments to her. (1) Referring to Vella and another branch manager, Kiser allegedly commented, in August 1999, that it was "good to have these young, good-looking women to get out there and bring in some new business." (Vella Dep. at 107-08.) In her complaint, Vella characterizes this remark by Kiser differently from the way she described it in her

---

[1] During this interview process, Vella was told that Alabama Central sought to hire a branch manager who could improve the loan and deposit volume at the Homewood branch. Kiser told her that the Homewood branch needed a "desperate overhaul" and that he was looking for someone to help the branch return to an acceptable level of performance. (Vella Dep. at 28-29.)

2

deposition. In her complaint, she alleges that Kiser made a comment to her regarding "having young women employed to 'hustle' business." (Compl. ¶ 11). (2) In August 1999, but on separate occasions, Kiser told Vella that one of the Homewood branch tellers did not look good in blue jeans, and he remarked that another teller wore short skirts. (Vella Dep. at 39, 111-12.) (3) In December 1999, Vella claims that she overheard Kiser remark to a teller that she looked good when she filed. (*Id.* at 112.) (4) In December 1999, Kiser commented to Vella that he was not willing to rehire a former employee because he felt like she had used Alabama Central for its medial benefits during her pregnancy. (*Id.* at 164-66.) (5) Vella claims that Kiser used vulgar language on several occasions when speaking to her, that he referred to two other females as "bitches," and that he generally used vulgarities when in conversation. (*Id.* at 127.)

In November 1999, Vella and Kiser attended a business fair. Vella testified that the following exchange occurred during this fair:

> Mr. Kiser stated that his girlfriend was in town from Montgomery and he was with her and that's why he did not return my phone call. I said that's fine. You know, I don't want to get into that. Mr. Kiser stated, oh, it's no big deal. It's not like I love her or anything. It's not like I would ever marry her. It's just my girlfriend. I asked Mr. Kiser why he was telling me that, that I did not think that was appropriate for my supervisor to be telling me those things. His voice changed. He changed the subject and began asking me about Homewood's NSF report.

3

(Vella Dep. at 109-10.)  During this same business fair, Vella claims that Kiser made comments about women who walked by him, that he maneuvered around the table to look at women passing by him, and that he stood up from the table to follow one woman. (*Id.* at 110.)  Kiser does not recall any of these incidents.

In addition to the aforementioned episodes, Vella alleges that Kiser was generally hostile towards her.  (Vella Dep. at 120.)  Specifically, Vella claims that Kiser frequently spoke to her in a loud tone and invaded her personal space.  (*Id.* at 123.) During these "hostile" incidents, Vella asserts that Kiser would typically take her into an office, close the door, and "proceed to back me in the corner invading my personal space with a loud voice and very hostile coming at me asking what was going on with the branch, what were the problems."  (*Id.* at 124-25.)  She alleges that she felt like her personal space was being invaded when Kiser "got to within an arm's length of her."  (*Id.* at 125.) Kiser also allegedly treated Vella in a hostile manner when she attempted to speak to him about his inappropriate comments.  (*Id.* at 162.)

During Vella's tenure, the Homewood branch posted poor volume in deposits, as it had done before she got there, and the branch's overall performance remained poor.  Citing the poor performance of the Homewood branch, as well as problems with Vella's lack of organization and misrepresentations made by her,

4

defendants contend that the decision was eventually made that Vella should be replaced. (Kiser Dep. at 39-41, 69-76.) Vella submitted her resignation on February 9, 2000--the same day she learned that her employment would be terminated. She denies that she voluntarily resigned.

Defendants claim that Vella was counseled by Kiser on several occasions regarding her lack of organization and the overall untidiness of the Homewood branch. (Kiser Dep. at 22-24.) Kiser recalls making notes in her personnel file as to these organization and tidiness problems, but he does not recall whether his assessments of Vella's deficiencies were formally recorded in her personnel file through an employee evaluation or other written notice or reprimand. Vella disputes that Kiser or anyone else counseled her about organization problems, and she also argues that such alleged counseling cannot be proven because Alabama Central has lost Vella's personnel file. Furthermore, Vella claims that she never received any reprimands about her job performance.

In October 1999, Vella arrived at a staff meeting one and one-half hours late, and she left the meeting prior to its conclusion. (Kiser Dep. at 26, 29; Vella Dep. at 79-86.) Vella explained her tardiness to Kiser by claiming that she got tied up at the branch, even though two tellers from another branch had been sent to the Homewood branch so that Vella could attend the

5

meeting. (Kiser Dep. at 27-28; Vella Dep. at 82.) According to Kiser, Vella needed to leave the meeting early to lock the Homewood branch at the close of business. (Kiser Dep. at 29.) Kiser subsequently learned that Vella did not go to her branch after leaving the meeting and that the visiting tellers were left at the branch. (Kiser Dep. at 30-31; Vella Dep. at 86-87.)

Though Vella does not dispute that she arrived late to the meeting or that she left the meeting early, her recollection of the meeting differs substantially from that of Kiser. Vella claims that she and Kiser had the following exchange:

> I told Mr. Kiser there was no one to lock up the branch, and, second, I had to pick up my child from day care. He told me the branch would get locked up, that it was being taken care of. But I still had to pick up my child from day care. The meeting was running late. I did not feel that the information at the end of the meeting--David--the speaker was David. He was in charge of computers. I did not feel--I felt like I could leave early. I asked Mr. Kiser--told him that I appreciated someone locking up the branch. I still had to pick up my child before six o'clock from day care and was told that I could leave. I did ask for permission.

(Vella Dep. at 86-87.)

During Vella's employment, Alabama Central's policies prohibited sexual harassment, and they set forth the procedures for complaining about harassment. Vella received copies of these documents, and she was aware of the procedures to follow when reporting harassment. (Vella Dep. at 94-97.) Vella claims that she attempted to avail herself of the sexual harassment policy

6

and to follow the proper procedures thereunder. According to the complaint procedure, the first step was to discuss the problem with the employee's supervisor. Because Vella's problem concerned her supervisor, she claims that she was obligated to proceed directly to the second step; this step required discussion of the problem with management, which would have been Kiser and Douglas Smitherman, Vice President of Finance at Alabama Central. At this second step, management was required to document the complaint and provide a resolution of the employee's problem. Vella argues that, because a resolution was not provided when she complained to Kiser and Smitherman on separate occasions, she was required to proceed to the third step, which necessitated reporting her complaints to the president of Alabama Central, Ronald Haas ("Haas"). Though Vella verbally attempted to report her complaints about her problems with Kiser to Haas, she did not fully comply with the complaint procedures because she did not submit a written complaint.[2]

According to Vella, she attempted to report Kiser's behavior to Haas on six different occasions. (Vella Dep. at 98-105.) Vella testified that, during these attempts, she reported her need to speak with Haas about Kiser. (*Id.*) In response, Haas directed Vella to speak with Kiser about matters regarding the

---

[2]Vella explained in her deposition that she did not submit a written complaint to Haas because he did not respond to her verbal complaints.

7

branches because Kiser was solely responsible for the branches. (*Id.*)  Defendants assert that Vella never informed Haas that her complaints concerned allegedly harassing behavior by Kiser and that Vella never informed Haas that she felt she was being sexually harassed.  Vella asserts that she was never given the opportunity to mention the matter of sexual harassment to Haas because Haas consistently referred her to Kiser.

Vella asserts that, following her failed attempts to speak with Haas, she reported to Smitherman her complaints regarding Kiser's inappropriate comments, the working environment, and the inadequate staffing at the Homewood branch.  (Vella Dep. at 106-07.)  Vella intended, by reporting her complaints to Smitherman, to comply with the sexual harassment policy.  (*Id.* at 115.)  She testified that she asked Smitherman where to direct her complaint because she had seemingly exhausted the final step in the complaint procedures by reporting her complaints to Haas.  (*Id.* at 116.)  According to Vella, when Smitherman heard of Vella's problems with Kiser, Smitherman responded:  "[t]hat is [Kiser] for you."  (*Id.* at 115.)  Though Vella complained to Smitherman, she never asked him to take any action to remedy her problems with Kiser's behavior.  (*Id.* at 116.)

8

II.   DISCUSSION

A.   Motion to Strike the Affidavit of Vella

Before turning to the Rule 56 motion, the court must first consider the motion of defendants to strike the affidavit of Vella. Though Vella's affidavit contains statements that do not appear verbatim in her deposition testimony, many of these statements are consistent with allegations contained in Vella's complaint. The characterization, in her affidavit, of Kiser's comments regarding the employment of young females in the credit union may possess a slightly different connotation from her deposition testimony; these statements, however, are not so manifestly different as to be an irreconcilable conflict. The statements carry the same basic meaning. Thus, the motion to strike, insofar as it pertains to the aforementioned statements, is due to be denied. However, defendants' motion to strike is due to be granted to the extent it addresses Vella's statement in her affidavit that she believes her complaints about Kiser's harassment resulted in her termination. Vella's affidavit contradicts, without explanation, her previous deposition testimony in this regard.

B.   Sexual Harassment Claim

To establish a prima facie case of sexual harassment, a plaintiff must show:

> (1) that "she belongs to a protected group;" (2) that she "has been subject to unwelcome sexual harassment,

9

> such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;" (3) that the harassment was "based on [her] sex . . . ;" (4) "that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) "a basis for holding the employer liable."

*Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000) (citations omitted) (alterations in original). Furthermore, "the sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). To determine whether an environment is sufficiently hostile or abusive, courts should consider the totality of the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-88 (citations omitted). The court in *Faragher* further noted that offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment." *Faragher*, 524 U.S. at 788.

Vella's allegations do not establish a prima facie case of sexual harassment. Considering all of the episodes and instances previously discussed and viewing those in the light most

10

favorable to plaintiff, the comments, the vulgar language, the invasion of Vella's personal space by coming within an arm's length of her, the use of a loud tone when speaking to Vella, and the following of women when conducting business for Alabama Central do not rise to the level of severity and pervasiveness required by the Eleventh Circuit to prove that a hostile or abusive environment existed within the contemplation of Title VII.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999); *Gupta v. Florida Board of Regents*, 212 F.3d 571 (11th Cir. 2000).  Though the incidents complained of occurred in a relatively short time period of eight months, Kiser's conduct, if sexual in nature, was not frequent because Kiser visited Vella's physical place of employment only once or twice per month.  Though Vella might have viewed Kiser's remarks as subjectively offensive, these remarks, even when viewed in the light most favorable to Vella, could not be considered by a reasonable person to be severe, hostile, or abusive.  A reasonable person in the workplace is entitled to Title VII protection, but not from everything said or done that might cause hurt feelings.  Additionally, most of Kiser's comments and actions were not directed at Vella; therefore, his conduct cannot be viewed as physically threatening.  In fact, the only time that Kiser directed allegedly harassing behavior at Vella was when he invaded what she said was her personal space and spoke to her in

11

a loud voice. This behavior, however, has not been proven to be sexual in nature, and, consequently, it cannot substantiate a claim of sexual harassment, much less a hostile sexual environment. Moreover, the evidence does not suggest and Vella does not argue that Kiser's behavior interfered unreasonably with her work performance.[3]

This court reiterates that Title VII is not a federal civility code and that Title VII does not prohibit all verbal or physical harassment in the workplace. See *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998); *Johnson*, 234 F.3d at 508. If the court were to find in the case at hand that the evidence established a prima facie case of sexual harassment, then the court would be extending the role of Title VII beyond its present limits. Considering Vella's allegations of sexual harassment along with her admission that Kiser never referred to her in vulgar terms, never touched her, and never approached her for sexual favors, this court holds that defendant Alabama Central's summary judgment motion on Vella's sexual harassment claim must be granted.

    C.    Retaliation claim

Title VII prohibits adverse action against an employee in response to a charge or participation in a proceeding addressing

---

[3] The evidence suggests that the only factor from the workplace environment, if any, affecting Vella's performance is the lack of adequate staffing at the Homewood branch.

other employment practices made unlawful under Title VII. "To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal relationship between the two events." *Johnson*, 234 F.3d at 507 (citations omitted). Complaining to superiors constitutes statutorily protected expression. See *id*. Sufficient evidence exists from which a fact-finder could reasonably believe that Vella engaged in statutorily protected expression when she attempted to complain to Haas, Smitherman, and even Kiser regarding what she believed to be sexual harassment. Furthermore, it is not disputed that Vella's termination constitutes an adverse employment action.

Turning to the third required element of causation between the protected conduct and the adverse employment action, Alabama Central provides ample evidence to establish that Vella's termination was motivated solely by legitimate, nondiscriminatory reasons. The performance of the Homewood branch had not improved during Vella's tenure, and Vella does not try to prove to the contrary. Kiser experienced problems with Vella's lack of organization, her tardiness to meetings, and her representations that were at least misleading, if not false. Nevertheless, a genuine issue of material fact exists as to whether Alabama Central terminated Vella in retaliation for her complaints

13

regarding Kiser. Although the affidavit testimony of Vella, concerning her belief that her termination was a retaliatory act, cannot be considered by this court and cannot be heard by the jury, a reasonable fact-finder could infer from the other evidence in the record that the decision to terminate Vella was made in retaliation for Vella's numerous complaints to Haas, Smitherman, and Kiser. Vella's retaliation claim may be weak, but the motion for summary judgment is due to be denied.

D. Negligence claims

Vella's state law claim for negligent supervision and training is based upon the failure of Alabama Central to adequately and properly supervise and train Kiser and Haas, and her state law claim for negligent hiring or retention is based upon Alabama Central's hiring and continued employment of Kiser and Haas after receiving actual or constructive notice of their incompetency. Liability on both negligence claims cannot be imposed unless affirmative proof establishes that the employer actually knew of the subject employee's incompetency, or that, the employer, had it exercised due diligence, would have learned sufficient information to impute knowledge of the employee's incompetency to the employer. *See Lane v. Central Bank of Alabama*, 425 So. 2d 1098, 1100 (Ala. 1983). Though the evidence is thin, sufficient evidence exists from which a fact-finder could reasonably conclude that Alabama Central failed to exercise

14

due diligence to learn of the alleged incompetency of Kiser and Haas when Vella repeatedly sought to draw her alleged problems to the attention of various Alabama Central officials. Therefore, the motion for summary judgment on Vella's negligence claims is due to be denied.

### III. CONCLUSION

For the foregoing reasons, this court concludes that summary judgment for Kiser on all Title VII claims is due to be granted, that both defendants are entitled to summary judgment on the invasion of privacy claim, that Alabama Central is entitled to summary judgment on the sexual harassment claim, and that the motion for summary judgment is due to denied in all other respects. A separate and appropriate order will be entered.

DONE this 7th day of March 2002.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE